We rise to this case on the document 2-73-0401. Naperville Womens Healthcare, P.C., and the Normal Professional Corporation. Naming primary, M.D., and Lianna. Required, M.D., plaintiff, counter-defendants, and appellants. Naming Michelle C. Parry-Siswick, M.D., defendant, counter-defendant, and appellee. Arguing on behalf of the attorneys, Mr. Sean Collins. Arguing on behalf of the appellee, Mr. Arthur D. Rosenstein. Mr. Collins. Thank you, Your Honor. May it please the Court, and good morning. I'm Sean Collins, honored to speak this morning on behalf of the appellants. Thank you for the opportunity. I wanted to begin by mentioning a couple of very important things that are not disputed. And I do believe they're very important. The reasonableness of the scope and duration of the non-compete, Dr. Carney's non-compete, is not disputed. The adequacy of the consideration is not disputed. Dr. Carney signed the non-compete in 2012. So you're talking about the consideration from the non-compete when they weren't associated with the hospital. Well, I'm talking about from the time she signed it, she was always associated with Naperville Women's Health Care. PC. PC, correct, Your Honor. And that restrictive covenant was in the agreement between the doctor and Naperville PC, correct? It was, Your Honor. Yes, it was, Your Honor. And it was signed by the parties in 2012. And there was no other restrictive covenant that was signed once the doctors went to Pravida. Is that correct? Well, there was no other restrictive covenant that was signed by any of the doctors, and I think that's very important. And I think, Your Honor, if I may address that point specifically, as Your Honors are aware, what the trial court said in making its decision in granting summary judgment for Dr. Carney was when these three doctors signed the joiner to the Pravida operating agreement that the legitimate business interest of Naperville Women's Health Care PC ceased to exist. Therefore, the restrictive covenant was no longer enforceable. Now, Pravida actually, was Pravida actually a successor entity to Naperville PC? Well, Your Honor, I think that's one reasonable interpretation of the facts here. I don't think that's what really happened. Your Honor, I believe what really happened here is Pravida was a vendor to this practice. It is clear that these doctors, these three doctors, contemplated changing their form of organization but never did. It's important that we look at the Pravida. Excuse me, you said they never did? They didn't. They did not sign an operating agreement? Well, functionally they did, yes, Your Honor. They signed a joiner. Legally and functionally they did. Yes, but we need to talk about what that means. If we look at that operating agreement, the Pravida operating agreement, nowhere does it say anything about Naperville Women's Health Care PC. It doesn't even mention it. Nowhere does it say that the PC's interest in its patients ceases to exist, that it can no longer enforce its contracts, that it no longer has an interest in its relationship with its doctors, not just Connie but also my clients, Flannery and Lucard. There is nothing in short, Your Honor, Your Honors, excuse me, about the Pravida operating agreement that says that anything about the PC, Naperville Women's Health Care PC's interest in the relationship with its patients, its interest in enforcing its contracts, its relationship with Dr. Carney is diminished in any way. It doesn't speak to it. You said that Pravida was just a vendor to this group? Well, Your Honor, if you look at what happened here, first of all the Pravida contract also says, and I believe this is very important, that it can be terminated without penalty in August of 2017. Now that doesn't describe an ownership relationship. It doesn't describe a joint venture or partner relationship. It doesn't describe an employer relationship. It's much more akin to a vendor. How were the monies paid out with this new relationship versus the old relationship? Well, there were bank accounts, as you see in the papers, Your Honor, there were bank accounts established and Pravida's name was on them. There's no question about that. The real question is whether that diminished at all Naperville Women's Health Care PC's interest in what it was doing at that location, because both before and after these doctors signed this jointer, these doctors and their staff, these same doctors and these same staff were providing the same service to the same patients at the same location in the same medical profession. But Naperville PC at that time, after the jointer agreements with Pravida, existed just to collect accounts receivable. Isn't that right? No, not at all. No? No, Your Honor. How not so? Well, because there is nothing that says that PC's legal status changed at all. So they were practicing medicine both with Pravida and Naperville PC? Well... Is that what you're telling us? First of all, there's nothing at all inconsistent with Pravida's name being on checks, for example, Pravida being involved in collecting accounts receivable, Pravida having its name on some documents, and Naperville Women's Health Care PC still maintaining its relationship with its patients, with its employees, with its doctors, with its right to enforce its contract. There's nothing in that Pravida operating agreement that says that because the doctor signed a jointer to it that Naperville Women's Health Care PC loses its right to enforce its contract. So you're saying the doctors had two sets of contracts while they were practicing medicine, contracts with Naperville PC that were still in existence and with Pravida at the same time? It did, yes. And I don't think that's unusual in professional relationships. I would add one important thing. When we look at the Pravida operating agreement, what you'll see, and you've seen it in the papers, but it's also all over that agreement, that Pravida, whatever it is, operates through so-called SBUs. You see that term in the operating agreement. You see that term in the papers. SBU. It talks about how an SBU is formed. It talks about the paperwork that has to be filed with the state. It talks about the formality of how the SBU will operate and make decisions. And the evidence before you is that didn't happen here. Now, I know Dr. Carnegie talks about SBU, SBU, SBU, SBU. As if they would say it enough, that would make it true. The Pravida operating agreement, if indeed we're supposed to be following that, if that's an important document here, then its terms say it can only operate through SBUs, and here's how an SBU is formed. And here's how the state of Illinois is told that an SBU has been formed. Those things didn't happen. So I didn't mean to go all the way around the mountain, Your Honor, in answering your question, but the doctors were operating through the PC, and they did sign the joinder to the Pravida operating agreement. The question really is, what does that mean? They never signed the non-compete under the SBU, though. Well, there was one. There was one prepared, but they didn't sign it. Isn't that what the one individual stated? Well, and that's true. And it's true, one was drafted. So what does that mean? What does that mean? I would urge that what it means, Your Honors, is that they never got to the three doctors, never got to the point where they were changing something important about what they were doing. I mean, what is being urged on this court is that these doctors signed a joinder to abide by a Pravida operating agreement which says nothing, nothing about an existing medical practice, and yet by that operation, that existing medical practice loses its rights to enforce its contracts, loses its protectable interest in its relationship with its patients, even though the same doctors are serving the same patients with the same staff at the same location in the same medical profession. But the staff isn't theirs anymore. The staff belongs to Pravida, correct? Well, I would not agree, Your Honor. They were hired by Pravida. They had Pravida handbooks. They had Pravida 401Ks. Pravida was collecting all the bills. Pravida owned the medical records. But, I mean, it seems like everything turned to Pravida as in 1116. Well, the question then is what does that mean? Does that mean that by that operation, that neighborhood women's health care PC lost its protectable interest in its patient relationships, that it lost its ability to enforce its contracts? And what I would urge, Your Honor, you can look at this record. You can look at the case log. There's nothing that says that. I realize that's the conclusion that's being urged here. But if something so consequential is going to happen, and remember, so we're talking about a non-compete. So we're not just talking about doctors in the medical practice, but we're talking about the interest of patients too and the interest of the public, and I know Your Honors are very concerned with that. That's an important part of any decision relating to a non-compete, right? If we're going to do something so consequential and say that this medical practice that these patients have been used to being served by for years by these doctors suddenly loses all of its rights, shouldn't we? So we have two different things going at the same time. We have Pravida and we have Neighborville PC, and they're both existing at the same time. Well. Are they or aren't they? Well. Existing at the same time. Well, the doctors signed contracts as to both. My question is this. You have two different things that you're saying are existing. I mean, Pravida is there. They've signed this agreement and they're operating in some fashion under Pravida. Yes. But you're saying at the same time they're operating under the PC simultaneously. Yes. Are you abandoning your argument that Pravida is a successor entity? No. Well, how? Successor means something. Successor means there's something before and something after. Not two things existing at the same time. Well, Your Honor, what we argue in the papers is nothing about whatever Pravida was caused Neighborville Women's Health Care PC to lose its relationship with its patients and its right to enforce its contract. Now, we have urged as an alternative argument that if the court were to find that Pravida somehow took over everything, then it's a successor entity, right? And the cases say that successor entities have the right to enforce non-competes. Otherwise, the conclusion has to be that the legitimate business interest in an existing medical practice relationship with its patients went away. No case says that that happens. That couldn't have happened. So, yes, we have argued in the paper, because Your Honor's seen it, that we have argued that Pravida was a successor entity. That's our secondary argument. If you ask me what I believe the facts really show here, it's that nothing about this jointer to the operating room, which says nothing about the PC, caused the PC to go away, to diminish its legal status, to diminish its right to enforce any of its contracts. The other thing I would urge, Your Honor, and I think it's important to remember, I know Your Honors have it firmly in mind, that we're talking about a summary judgment decision here. So if Your Honors are questioning what really happened here, what was Pravida really, what happened when these doctors, scientists joined her room? Did something important happen or not really? Do these two entities exist side by side? What really happened? Then I think what we're talking about is something that respectfully isn't right for summary judgment resolution, right? And so I think what happened here, with great respect to the trial court, because the court certainly worked very hard and thought a lot about this to try to get it right, I believe what happened here is that nothing about that operating agreement changed the legal status of the PC and its right to enforce its contracts, including the non-compete. That's what I believe is the best interpretation here. After that, if that is not an acceptable conclusion for this court, then I don't see how you get around the fact that there are disputed issues of fact having to do with what was Pravida, right? What happened in January of 2016 when Pravida assumed whatever role it took? What is the significance of the fact that Pravida's operating agreement says it operates through SBUs but no SBU was formed here? These are disputed issues of fact that respectfully I don't think can properly be resolved in a summary judgment posture, but that's what happened here. Well, if they were existing, if the two agreements were existing at the same time, why did the oral agreement about division of the profits? Because the Naperville PC arrangement already had that written down. So if they were still operating under that same arrangement and contract in Naperville PC, then the record reflects that the briefs discuss at length this separate oral agreement with regard to division of the profits after they signed the Pravida operating agreement. So can you explain that, please? Sure, but that's an alleged oral agreement. We dispute it. And I think the fact that it is alleged, even as alleged, is alleged to be identical with what is in the employment agreement that is at issue here means that what happened is what we got to that part of the case. And remember, we get only to that part of the case when we deal with whether there's an enforceable agreement. Because if what I'm urging is correct, that either summary judgment on enforceability should have been granted for us or at least denied as to Dr. Carney because there are trial issues, if I'm correct about one of those two things, then we don't get to a money judgment for Dr. Carney. First, we have to resolve whether Dr. Carney breached the non-compete, and if so, what damages ensued to the practice. So we wind up talking about this alleged oral agreement only because we've gotten past summary judgment. Right, I understand. The briefs cover all of this. Yes. That's why I'm asking. I apologize. I apologize. The oral agreement is alleged, and I think what's important to keep in mind, and we dispute it, what is important to keep in mind is that as alleged, it is identical. Dr. Carney testified on this day. It is identical in its terms to what's in the employment agreement that she signed. So what's going on here is Dr. Carney is urging, and unfortunately the court agreed, the trial court agreed, to the selective enforcement of an employment agreement. So she doesn't have to live by her non-compete, but she gets the benefits of its financial provisions. That shouldn't be. I mean, we got to summary judgment because the court found that PC lost its right to enforce its contract, this one in specific. Well, if it did, then it did, and we shouldn't be talking about what Dr. Carney is owed under that contract. Excuse me, counsel. I apologize. I don't mean to interrupt, but your time is up if you want to just conclude that sentence, and I'll see if the justices have any further questions at this particular point. Okay, Your Honor. I'm prepared to take questions, so sit down, whatever you tell me to do. Okay. All right. You'll have a chance for a rebuttal argument. Thank you. I appreciate the opportunity. Thank you. Mr. Rosenson. Good morning. May it please the Court, again, Arthur Rosenson on behalf of the appellant, Dr. Carney. I think it's important to note we have two... Counsel, I'm going to ask you to keep your voice up. There are people way in the back who need to hear you. I know we have a microphone, but it's a very big room, as you can see, so just... It sounds like you're shouting, but everyone needs to hear, please. Thank you. We have two standards of review that apply in this case. There is a de novo standard of review that applies to the summary judgment decision on the non-compete agreement, and there's a manifest weight of the evidence standard that applies on the accounting portion of the case and the breach of fiduciary duty claims, which went to trial. I want to briefly address the latter first and then head on to the non-compete agreement. Counsel, if you would permit, I have a question first. Do you agree with counsel that there were two agreements under which the doctors were practicing medicine at the same time? No. In 2016, the three doctors, Dr. Flannery, Luke Herrick, and Dr. Carney, were practicing medicine in one and only one way, as members of Pravidia, an Illinois limited liability company. They ceased practicing medicine in all respects on behalf of Naperville Peace City. That's a short and abbreviated name. As of December 31, 2015, there was never a time when they were practicing medicine simultaneously on behalf of the two distinct entities. Why didn't Naperville Peace City still have the right, however, to enforce the restrictive covenant after 2016? Under reliable fire for a restrictive covenant to be that is ancillary to a valid employment relationship, there must be a legitimate business interest of the employer privacy. In 2016, Naperville Peace City had the legitimate interest because it ceased engaging in the practice of medicine. It ceased caring for patients. It ceased treating patients. As a result, the protectable interest, which had existed for years beforehand, stopped. The mere fact that the corporation exists under the Illinois Secretary of State records doesn't mean that there continues to be a legitimate business interest. These three doctors... There was a non-compete agreement under the PC, correct? That is correct. Then there was a non-compete under the SBU, which had yet to be signed by all of the parties, correct? That is almost correct. But there was a draft SBU agreement, which neither Dr. Lukerek nor Dr. Carney ever saw, that Dr. Flannery had prepared that was never negotiated or signed. So I wouldn't go so far as to say that there was an agreement out there that they weren't aware of. One of the three doctors had it prepared, and then it was never executed and never became an actual agreement. So if there was a non-compete under the PC and then a non-compete under the SBU that was never circulated, never signed, wouldn't they still be operating under the non-compete under the PC in the meantime? From a legal point of view, for the Naperville PC employment agreement to be binding on another entity, there would have to have been some legal operation of law that caused the enforceability to be continued. For example, had that contract been assigned to Providia? Had Providia been the successor entity? Had there been a merger? Had Providia sought to enforce the agreement and Judge Fullerton entered a declaratory judgment stating that Providia had the rights under the document? Those would have been all possible viable ways that Providia could have come into this court and stated that we are an entity that has rights under this agreement, even though we weren't originally party to it, but we have now somehow obtained the legal right. But we know a couple of things. We know Providia isn't a party in this case, and clearly Judge Fullerton did not enter any judgment stating that Providia had any right to enforce it. In fact, in our response brief, we block quoted the exact quote of Judge Fullerton on this topic saying that it didn't have the right. We know from Dr. Ken Finkelstein's affidavit, who had nothing to do with Naperville PC, he's the sole president, sole manager of Providia, he stated in paragraph 15 of his affidavit, page C-135 of the record, Providia does not claim it has the right to block her, meaning Dr. Carney, from accepting a job with DuPage Medical Group. So there is no way that, at least in this posture, in this case, the way the plaintiffs have presented it, that we're in a position to state that Providia has any rights under this document, which is why we explained in the brief that the case law is not important that they cite it, because in all of those cases, it was the acquiring entity that was saying, we want the rights because we acquired all of the assets or interests of the other entity. In fact, on page 1 of the reply brief, paragraph 2, plaintiffs actually state Providia did not acquire any assets of Naperville Women's Healthcare PC, and that's in the fourth and fifth lines. So they're not claiming Providia acquired any assets, the employment agreement is an basis to claim, either de facto or explicitly, that somehow Providia, not acquiring this case, cannot enforce this agreement. The opposing counsel argues that Providia operates through SBUs, and that there was no SBU formed here. So how was this entity operated? That's, the statement made by opposing counsel is incorrect. Providia, every office that Providia has is a strategic business unit, an SBU. There could be an OB-GYN office in Aberdeen. There could be a pediatric office in Elgin. The moment the doors are open, the SBU exists. The right to have a written SBU agreement is optional. That is reflected in section 4.2 of Defendant's Exhibit 16, where it states, here are the things that the members of the SBU can do, and they can put it in writing. But it's not obligatory, because the office exists. They can decide how they want to manage their patients, how they want to schedule it, how many physicians they want to have working there, or mid-level providers. But the SBU exists. There wasn't any extra hoop that had to be jumped through. All that needed to be signed, once that joint agreement was signed by the three doctors, and they became members of Providia, and bound by the Providia operating agreement, there was nothing else that they had to do. Now, there are certain requirements in the operating agreement, that if they want to sign certain contracts, or undergo certain obligations, they need to get Providia's approval from their board of directors, or from their managers. So there are certain restrictions. But as far as the operation of the office, there wasn't any condition preceded that had to exist, other than them joining the office as members. Excuse me, them joining the LLC as members. Talk about the oral agreement. Could you repeat that? Talk about the oral agreement. The oral agreement. The section 4.2 of the Providia operating agreement allows the members who are working in an office, and SBU, to decide how they want to compensate themselves and the people who are working in that office. At the trial, so now we're not really dealing with the motion for summary judgment, because this testimony came up at the trial. At the trial, Dr. Carney testified that the doctors discussed, well, we're going to Providia, how are we going to pay ourselves? And they said, let's keep it the same way that we've been doing it before. We'll split it a third, a third, a third, and we'll deduct our personal expenses from this. Dr. Flannery did not take the stand at trial. Dr. McCarrick offered no testimony. Therefore, it was not against the manifest weight of the evidence for Judge Fullerton to state that I find Dr. Carney's testimony to be credible, not only because she sounds credible, but because it made sense. It was an agreement that was consistent with how the parties had previously performed. And therefore, there was nothing inappropriate about this procedure. And to indirectly corroborate this, we know that the IDA, the income distribution analysis that the parties all met and discussed that went through the period January 1, 2016, through June 30, 2016, they all met and discussed it, and they were fine with the numbers. And if one looks at that exhibit, you can see that the income was divided a third, a third, a third, and that individual practice expenses were deducted equally, that individual expenses were deducted based on how each physician had their personal expenses. That June 30th IDA corroborated the testimony of Dr. Carney, who said, this is what we agreed to do. And then we had a meeting in July, we looked at the numbers, and everybody was fine with that. So as a result, there is no basis to claim that Judge Fullerton's following that testimony, accepting that testimony, was against the manifest light of the evidence. There was no contrary evidence to the record about any other agreement or that Dr. Carney was incorrect from plaintiffs. Now, counsel, that oral agreement focused on, or at least we've been talking about, the focus on the division of profits. Did that oral agreement also encompass buyout provisions? No. Where did those come from? There was no testimony about any discussion between the three members regarding anything concerning a buyout as providium. There was in the Naperville PC various terms about buyouts, that if somebody's bought out a 60-month payment schedule, five years, none of that ever took place. Now, why those conversations did not occur would be speculation, because there isn't anything in the record. I can only state that at trial, there was no testimony put on by the plaintiffs about any agreement about 60-month payment terms as members of providium, and there was no Plaintiffs did not question her on this. It was simply an argument that came up to say, Judge, look, if you're going to require us to make this payment, at least give us that five-year term that we had in the Naperville PC document, to which Judge Fullerton stated, and this is him again in our response brief, stated, what happened with Naperville PC has got nothing to do with how I'm ruling now. I'm giving an accountant to these three members of providium for the income that they agreed for Naperville PC. That's not where this money was earned. This money will only deal with the revenue earned from professional services rendered January 1, 2016 forward. Had there been an issue regarding revenue earned 2015 or beforehand with respect to services rendered on behalf of Naperville PC, then maybe that would have been a different story, but there was no testimony regarding that topic at trial, and it was never raised by plaintiffs at trial regarding that issue. And based on what did he require a payout based on division of the assets as well? His comment was, well, his ruling was, we have a set amount of money that under the agreement, this amount of money is owed to each party. The money has all been collected. Excuse me, under this agreement, meaning? The oral agreement that they were going to provide a third, third, third revenue. Okay. Yes. And then he said, all the money has been collected. There were still more accounts receivable. We are not a cross appellant. We did not ask for more money, but there were accounts receivable still outstanding in April of 2017 for work performed at providium. And Judge Fulton McClure, and we're ending this now, this is when the accounting hearing took place, and this is my ruling. It doesn't matter if future money comes in. How about the assets, though? Wasn't there a payout based on certain hard assets that still were in practice? Correct. Of the $150,000 approximate judgment, around $30,000 were related to the assets. There was a hearing on that, and once again, the court's rulings were not against the manifest weight of the evidence. He relied on the first amended accounting that was tendered by a plaintiff from Steve Blum, who was the accountant, that listed the assets and the values. Okay, but my question really is, based on what? Did he look at the former contract with Naperville PC? There was no oral testimony regarding this. Where did he get the idea that there should be a payout based on these assets as well, that $30,000 or so? Where did that come from? It came from the fact that the assets were all owned by the three doctors. For example, the laser machine. We offered it to evidence, defendant's exhibit 9, $180,000 asset acquired by the three doctors, which they signed for with respect to that particular piece of equipment. So on that particular asset, there was independent evidence. There wasn't evidence on every single other asset, other than comments from Dr. Carney saying that these were the assets that the three doctors were using at the time. Did they agree to divide those assets three ways in the PC contract or in the SVU, I guess is the question. Well, certainly the assets, most of the assets predated the SVU. The major asset that I mentioned beforehand regarding this laser, that was posed. But many of the other ones, well, maybe the medical supplies may have related to it. But most of the assets, for example, tables, examination tools, et cetera, would have predated the SVU being formed. There was no argument raised by... So when they came into the SVU, doesn't everything then flow into this SVU, and the contract with the PC is no longer? Isn't that your argument with respect to the non-compete? So why would it be any different with everything else? With respect to the assets addressed to us, number one, at no time during the trial or during the appellate briefing did plaintiffs raise an argument that the trial court had no right or basis to allocate the assets by a third, third, or third as he did. So I'm going to answer the question directly, but I want to be clear that had plaintiffs wished to raise that issue, they had an obligation to brief and cite supporting case law. Well, why would they raise the issue? Because it ignores in their favor. If it's going to go under the old PC, they wouldn't raise that issue because that really is consistent with what they're saying here. If the division of property is going to go under the PC, why doesn't the non-compete apply under the PC as opposed to what you're saying? Oh, there's now an SVU, so that non-compete is no longer. Do you follow what I'm saying? Maybe I'm confusing you. I think I do, and if I'm wrong, please correct me. I don't think the two issues are related. I understand what the courts say, but they believe that they're related. The non-compete agreement needs a protectable, legitimate business interest to protect. No matter anything else that's happening, once Naperville PC stopped working, that business interest disappeared, and nothing regarding any assets would retroactively change them. It's an independent inquiry. But going back to the other issue, the court required an accounting. Plaintiffs submitted an accounting listing the assets. They submitted the accounting from their account. We addressed those assets that were listed, the bids that were attributed to it. The court considered all of that evidence and made its ruling about what were the correct numbers, the mistakes that were made in years, typos and figures, and no time did they state that there wasn't, that Dr. Carney didn't have her one-third share in it. So I believe that there's a basis to affirm that $30,000 portion of the court's decision based on that record because there was no skew that these were the three doctors' assets that they had all acquired. But I don't think that there's any relationship between that issue and the non-compete agreement. Do you want to just wrap up in a sentence? I will wrap up. The court is well aware that non-compete agreements operate as restraints of trade in the employment agreement context. I believe that although it is a de novo review, that Judge Fullerton's analysis is worthy of consideration. It's consistent with the case law. And there's no basis to claim, as counsel suggests, that there are any genuine issues of material fact. There are no genuine issues of material fact. The affidavits and the documents are undisputed that were submitted, and Judge Fullerton was within his rights in making this ruling. And as far as the trial rulings, none were against the manifest weight of the evidence. Thank you. Thank you, counsel. Mr. Collins? Once again, may it please the Court, the Pravidia operating agreement does require if the operating agreement is to be followed that it operate as an SBU. Here are some examples. Paragraph 1.4 requires the filing of the state of SBU papers. There are paragraph 2.5 references an SBU agreement with a capital A, and that term is also in 2.7. It's clear that this Pravidia operating agreement contemplates if there is legitimately an SBU. It is to operate through a written SBU agreement. That's a term in this document that Your Honors are being urged as the document that deprived the PC of its rights to enforce its own contract. Does it explicitly state that, though? State what? Does it explicitly state that you must form an SBU through a written agreement? Do you see that in any way, no? It does not say that. But I don't know what else it could mean, respectfully, Judge. If it says these kinds of decisions are made via an SBU agreement, what else could it mean? What is being urged on this Court, Judge, is that when these doctors signed this jointer, not only was Naperville Women's Health Care deprived of its rights, but automatically, by that, nothing more than those three signatures, a Naperville Women's SBU was formed. I would ask, Your Honors, when you look at the record, my recollection of the record is I don't see on any of the checks that sort of thing referenced to an SBU. I see it in the lawyer's argument. I see it here in the Pravidia operating agreement. I don't see it in the documents related to the practice, that anything says SBU. And so I think what we're talking about here, in my respectful opinion, I'm urging on this Court, that this Pravidia operating agreement doesn't have and can't have the legal effect. One, because it doesn't say anything about diminishing the rights of the PC or extinguishing anybody's right to enforce a non-compete, but furthermore, because it doesn't even follow its own terms. But beyond that. The Finkelstein affidavit says that based on the doctors joining Pravidia, which it says based on the doctors joining Pravidia, Pravidia created a strategic business unit called Naperville Women's Health Care. It doesn't say anything about it in the written agreement or anything else other than them just joining Pravidia. Your Honor, a couple of things. One, Finkelstein is not a lawyer in his testimony, both in his declaration and also his deposition is just loaded with legal conclusions that respectfully Dr. Finkelstein is not qualified to make. Also, if what he was saying was true, you'd see different paperwork than you do. You don't see SBU anywhere. Nobody is holding out Naperville Women's Health Care as an SBU to its patients, to anybody else. In other words, the things that this agreement states or at least, Your Honor, implies are supposed to be done if Naperville Women's Health Care is operating as an SBU was not done. And what I'm suggesting, Your Honor, is if this document is to have a legal impact, that it is being verged on in this court that Naperville Women's Health Care, PC, essentially ceased to exist as a legal entity and to enforce its own contracts, then you'd see more than is here. You'd see documents that you don't see. Your Honor, see those kind of documents in your line of work every day. You don't see that here. You know what those documents look like. This isn't something that ought to be done by implication or in some other implied way. Something very important is being verged on, Your Honors, has happened here, and there's no document that says it. There's no case law that says it, respectfully. But did you not ask that Providia be given the right to enforce this restrictive covenant, Counsel? As an alternative argument, yes, Your Honor. What we said to the court was, and what I would also say to Your Honors, and I am saying to Your Honors, we said in your paper, and I'm saying it this morning, that if you don't believe I'm right that Naperville Women's Health Care, PC, notwithstanding the joint of these documents, retain its rights to enforce the non-compete with Dr. Carney, then we have to ask ourselves, where did that legitimate business interest go? There's no authority that says it just evaporated into the thin air. It went somewhere. And our alternative argument, Judges, to the trial court is, Your Honors, and I'm saying the same thing to this court, if you think it went somewhere, if you think Naperville Women's Health Care, PC, no longer has it, then where did it go? There's no authority for it going nowhere, for it just evaporating and being gone. Where did it go? Well, it terminates. It doesn't evaporate. I mean, when a contract ends, the contract was between Naperville, PC, and a doctor. But if you notice, Your Honor, the provision of this contract we're talking about, the contract which includes the non-compete agreement, says that the non-compete provision explicitly survives the termination of the contract. That's a term? Forgive me. I want to be precise about this because Your Honor raised the question. At Section 23 of the contract between Dr. Carney and the PC, which includes a non-compete provision, it says the provisions of Section 6, 7, 12, and 13 of this agreement shall survive such termination. And the non-compete provision is found at Section 13. Section 13 is explicitly one of the provisions that survives termination, and furthermore, by operation of paragraph 18 of this same contract, it says explicitly that this agreement, it's called binding effect, this agreement shall be binding upon and in order to the benefit of the corporation, which means the PC and the physician and their respective heirs, legal representatives, successors, executives, and administrators. What's the point? The point here is that when Dr. Carney signed this, this is a contract that says those things, that it binds even successors of the PC, that it survives even termination. And so Dr. Carney was on notice that whatever happened next, she was still going to be bound by this. And so whatever we say happened next, and there can be a fair dispute about what the impact of Pravidia was. The question is whether those disputed facts are material to this Court's resolution of what really happened here. I don't think they are, but if you find they are disputed in their material, then respectfully summary judgment should not have been granted, and this should be re-landed back for a finding of what that impact truly was. Thank you very much, counsel. I'm very grateful for your time this morning. Thank you. Thank you, counsel, for your arguments this morning. The Court will take the matter under advisement and render a decision in due course. We stand in brief recess until the next case. Thank you.